**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq. (CA Bar # 330090)
scott@edelsberglaw.com
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (305) 975-3320

*Counsel for Plaintiff*

[*Additional Counsel on Signature Page*]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMIE CANALES, *Individually and On Behalf of All Others Similarly Situated*, <br><br> Plaintiff, <br><br> v. <br><br> JP MORGAN CHASE & CO. and J.P. MORGAN SECURITIES LLC, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Jamie Canales ("Plaintiff"), on behalf of himself and all others similarly situated, brings this action as a class action against defendants JPMorgan Chase & Co. ("JPMorgan Chase") and its subsidiary J.P. Morgan Securities LLC ("JP Morgan Securities") (collectively "Defendants").

## INTRODUCTION

1.    A cash sweep account is a type of bank or brokerage account that is linked to an investment account and automatically transfers funds when the balance is above or below a preset minimum. Typically, this is used to sweep excess cash into a money market fund, where it will earn more interest than an ordinary bank account. This case arises from Defendants' exploitative and unfair implementation of their Bank Deposit Sweep Program (the "Program"), resulting in the breach of Defendants' fiduciary duties owed to Plaintiff and similarly situated retirement account investors as their investment advisors.

2.    Specifically, when acting as their customers' agents and fiduciaries, defendant JP Morgan Securities "sweeps" uninvested cash balances in its customers' accounts and deposits that cash into accounts located at its affiliated bank, JPMorgan Chase Bank N.A. ("the Bank"). Because the Bank's accounts pay far below market rates of interest, Plaintiff and other Class members have lost significant amounts of interest they would have otherwise earned had JP Morgan Securities swept their uninvested cash into bank accounts that pay a market interest rate.

3.      In its agreement with its customers, JP Morgan Securities specifically acknowledges that it acts as its customers' fiduciary "with respect to all transactions relating to" the "Bank Deposit Sweep Program." Under the broad scope of the agency, "all transactions relating to" the Program include the selection of the banks to participate in the Program; the selection of the type of accounts to which the Program applies; the selection of the type of bank accounts in which the JP Morgan Securities customers' funds are swept; the negotiation and agreement as to the interest rates to be paid to JP Morgan Securities customers under the Program; and the negotiation and agreement as to any compensation or the foregoing of such compensation by JP Morgan Securities for the benefit of either its customers or another entity, including the Bank.

4.      From 2018 through March 2019, and again from March 2022 onwards, when the Federal Reserve began raising the target federal funds rate, the reasonable value of swept cash consistently exceeded the amounts paid by Defendants on sweep accounts. Comparable brokerages such as Fidelity Investments, R.W. Baird, Robinhood, and Vanguard Investments, which did not sweep cash to affiliated banks, but rather swept cash to independent, unaffiliated banks, paid substantially higher rates on swept cash, than Defendants paid. For example, Fidelity paid retirement investors as much as 2.72% APY on swept cash regardless of AUM, starting in August 2023, and R.W. Baird paid retirement investors between 2.07% to 4.15% on swept cash, depending on cash balances, as of September 8, 2023.

5.      Other metrics, including the federal funds rate, and rates paid by online banks, rates paid on JP Morgan Premium Savings accounts, and government money market funds, further evidence that the paltry rates paid by Defendants on retirement sweep accounts were not reasonable.

6.      JP Morgan Securities breached its fiduciary duties when it placed its customers' cash in low interest-bearing accounts held by its own affiliates and then pocketed the unpaid interest as additional profit.

7.      Worse, JP Morgan Securities failed to adequately disclose to its customers that, as to the Program, it was essentially providing a kickback to its own affiliates at its customers' expense. Specifically, Defendants shortchanged their customers for their and their affiliates' benefit by negotiating with the Bank one-sided transactions that swept cash into exceedingly low-interest accounts.   JP Morgan Securities failed to disclose and discuss these conflicted transactions, much less obtain informed consent from its customers and principals.

8.      Plaintiff brings this action individually and on behalf of a Class of similarly situated individuals for breach of fiduciary duty, breach of contract, violations of New York's General Business Law § 349 ("GBL") and, as to the California Sub-Class, violation of California's Unfair Competition Law ("UCL"), to recover damages arising out of Defendants' violations of the law, and for such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §1332(d)(2), as this action is brought as a class action on behalf of class members, one or more members of the class are citizens of a state different than the Defendants, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

10.     The Court has personal jurisdiction over Defendants because JPMorgan Chase regularly transacts business in California through its wholly owned subsidiaries, including defendant JP Morgan Securities, and thus has minimum contacts in California and in this District.

11.     Venue is proper under 28 U.S.C. § 1391 because among other things a substantial part of the events, omissions, and/or relevant conduct by Defendants giving rise to Plaintiff's claims occurred in this District (where Plaintiff resides and conducted business with Defendants).

## PARTIES

### a. Plaintiff

12.     Plaintiff Jamie Canales is a customer of JP Morgan Securities and is a resident and citizen of California. Plaintiff maintained a Roth IRA in a Self-Directed Investing Account with JP Morgan Securities in which cash was held over the course of the life of the account. While Plaintiff was a JP Morgan Securities customer, the cash held in his account was automatically "swept" into a low interest-bearing bank

account at the Bank pursuant to the Bank Deposit Sweep Program.

**B. Defendants**

13.     Defendant JPMorgan Chase is a financial services firm based in the United States with operations worldwide. JPMorgan Chase is a holding company that conducts business through its subsidiaries including Defendant JP Morgan Securities, and non-party the Bank. JPMorgan Chase is a Delaware corporation with its headquarters in at 383 Madison Avenue, New York, NY.

14.     Defendant JP Morgan Securities is a Delaware limited liability company headquartered in New York, NY. JP Morgan Securities is a broker-dealer and investment advisor registered with the U.S. Securities & Exchange Commission. It is the wholly owned and principal non-bank subsidiary of JPMorgan Chase, through which JPMorgan Chase conducts securities, underwriting, dealing and brokerage activities in the United States, including California.

## FACTUAL BACKGROUND

**A. JP Morgan Securities' Customer Relationship**

15.     The relationship between JP Morgan Securities and its customers, including Plaintiff, is set forth in JP Morgan Securities' Brokerage Account Agreement and Disclosures (together, "JPM Securities Agreement"). The JPM Securities Agreement incorporates the "JPMorgan Chase Deposit Account", with the terms described in a document titled "The JPMorgan Chase Deposit Account" ("JPM Deposit Account Agreement"). The JPM Deposit Account Agreement

provides that "[s]election of the Deposit Account for the sweep of available cash in your account will be deemed your acknowledgement and consent to the features and terms of the Deposit Account."

16.    The JPM Deposit Account Agreement states that "JP Morgan Securities acts as exclusive custodian and agent with respect to all transactions relating to the Deposit Account feature of customers' JP Morgan Securities accounts."

17.    By entering a custodial and agency relationship with Plaintiff and members of the putative Class, Defendants assumed fiduciary duties including the duty of loyalty, the duty of care, the duty to act in good faith, the duty of full and fair disclosures, and the duty to make prudent investment recommendations. These fiduciary duties are meant to always ensure Defendants act with integrity and in the best interests of the client.

18.    Defendant's fiduciary duties to as broker-dealers are described in Regulation Best Interest (Reg BI) under the Securities Exchange Act of 1934, which requires them to act in the best interests of the retail customer at the time a recommendation is made. Reg BI obligations broker-dealers, when making an investment recommendation, to meet four core obligations: *Disclosure* (providing certain prescribed disclosure before or at the time of recommendation, about the recommendation and the relationship between the retail customer and the broker-dealer); *Care* (exercising reasonable diligence, care, and skill in making the recommendation); *Conflicts of Interest* (establishing, maintaining, and enforcing

policies and procedures reasonably designed to address conflicts of interest); and *Compliance* (establishing, maintaining, and enforcing policies and procedures reasonably designed to achieve compliance with Reg BI).

19.     Defendants' fiduciary duties are also reflected in its Code of Conduct. *See*     https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/documents/code-of-conduct.pdf.

20.     The JPM Deposit Account Agreement states that JP Morgan Securities' customers are the owners of their funds on deposit with the Bank.

**B. The Bank Deposit Sweep Program**

21.     A "sweep program" is a "service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product as described in § 270.2a-7 or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation." *See* 17 CFR 240.15c3-3(a)(17).

22.     Sweep deposits play a pivotal role as a capital source for banks, empowering them to utilize these deposits for various corporate purposes. This includes activities such as making loans or investing in government securities. The disparity between the interest rate paid and the interest rate earned by a bank on those deposits is commonly referred to as the net interest margin ("NIM").

23.     The SEC, in its Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest, issued August 3, 2022, emphasized that "cash sweep programs" are a "common source[ ] of conflicts of

interest." *See* https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

24.     According to the JPM Deposit Account Agreement, the Bank—a corporate affiliate of JP Morgan Securities—is the exclusive option for the Bank Deposit Sweep Program.

25.     The JPM Deposit Account Agreement provides that "[t]he interest rate paid on Deposit Account balances will vary based on business and economic conditions … The rate is reset periodically at the discretion of JPMCB."

26.     Pursuant to the JPM Deposit Account Agreement and the JPM Securities Agreement, JP Morgan Securities acted as its customers' agent and exercised discretion with respect to the Program. For example, Defendants' Agreement states: (a) "JP Morgan Securities acts as exclusive custodian and agent with respect to all transactions relating to the Deposit Account feature of customers' JP Morgan Securities accounts"; (b) "At the discretion of JP Morgan Securities, you may be given additional cash sweep options, and you acknowledge that JP Morgan Securities may change the available sweep option(s) or offer different options for different customers"; and (c) JP Morgan Securities "may change the products available as cash sweep options for J.P. Morgan Self-Directed Investing Accounts."

27.     JP Morgan Securities exercised this discretion in bad faith to the detriment of its customers.

28.     The Bank Deposit Sweep Program primarily benefited JP Morgan Securities and its affiliates at the expense of its customers.

29.     JP Morgan Securities directed all accounts participating in the Bank

Deposit Sweep Program, including Plaintiff's, to its affiliate Bank.

30.    JP Morgan Securities enters transactions by which it establishes and pays unreasonably low interest rates to its customers in the Program. In contrast to the unreasonably low returns JP Morgan Securities pays its customers, JP Morgan Securities shifts to its affiliate the Bank a substantial portion of the beneficial returns on its customers' cash that would otherwise constitute its customary compensation in connection with the Program.

31.    JP Morgan Securities acknowledges that it the Deposit Accounts provide it with "a stable, cost-effective source of funding" it may use "to fund current and new businesses, including lending activities and investments." Further, it discloses that the "profitability on such lending activities and investments is generally measured by the difference, or 'spread', between the interest rate paid on the deposits and other costs associated with the Deposit Account, and the interest rate and other income earned by JPMCB on the loans and investments made with the deposits." Thus, JP Morgan Securities admits that by keeping the interest rates in Plaintiff and Class members' Deposit Accounts lower, it earns a higher profit.

32.    Through their operation of the Program, Defendants engage in self-dealing, creating a profit center that benefits only them, to the financial detriment of their customers.

### C. Defendants' Disclosures to Its Customers Regarding the Bank Deposit Sweep Program Contained Material Misrepresentations and Omissions

33. JP Morgan Securities' disclosures contain material misrepresentations and omissions regarding the Bank Deposit Sweep Program.

34. First, the disclosures state that "[t]he interest rate on the Deposit Account *may* be higher or lower than yields on other available cash alternatives (e.g., money market mutual funds)." (Emphasis added). This statement is false and misleading because, as Defendants knew at the time its customers entered the Program, the interest rate on the cash sweep deposit account *will* be lower than yields on essentially any other available cash alternatives.

35. Similarly, according to the JPM Securities Agreement, "the interest rate paid on Deposit Account balances *may* be higher or lower than the rate available to direct depositors of Chase Bank for comparable accounts." (Emphasis added). This statement is false and misleading because direct depositors in the Bank *will* receive higher interest rates than those paid on Deposit Accounts in the Program.

36. Defendants also fail to disclose the interest rates that the Program offers, instead only including a dead link to its website in the JPM Deposit Account Agreement. Today, that link directs to a page that "is unavailable right now,"[1] and, in 2023, it linked to a page stating "Oops, you found it! The one page we never want

---

[1]  *See*  https://www.chase.com/personal/investments/sweep-options  (last visited September 18, 2024).

you to see."[2]

37.    Conversely, Defendants never disclose the interest rates that their Deposit Accounts could have earned if their customers' sweep funds had been invested in comparable accounts with non-affiliated banks. This is a material omission of facts that customers would have found important in decided whether to use Defendants as their investment advisor.

38.    Defendants' disclosures contained additional misrepresentations and omissions of material facts about the Bank's role in the Bank Deposit Sweep Program. For example, according to the JPM Securities Agreement: "The interest rate paid on Deposit Account balances will vary based on business and economic conditions and is reset periodically at the discretion of [the Bank]." The JPM Deposit Account Agreement contains a similar disclosure. These disclosures are misleading by claiming that the interest rates paid to customers is a function of business and economic conditions. In fact, the interest rates on the Program are significantly below market rates and are not reasonably tied to any business or economic condition.

39.    Defendants also fail to disclose that JP Morgan Securities is using its discretion to negotiate and enter transactions with the Bank regarding the Program pursuant to which JP Morgan Securities agrees to artificially low interest rates for its customers' cash in the Program to the benefit of the Bank, then declines to charge

---

[2]*See* https://web.archive.org/web/20230313040049/https://www.chase.com/personal/investments/sweep-options (page capture on March 13, 2023).

the Bank customary fees for the Program. Through this scheme, JP Morgan Securities shifts to the Bank large returns on its' customers cash without obtaining customary fees it would normally incur if working with a non-affiliated bank. Thus, JP Morgan Securities put the interests of itself and its affiliated Bank ahead of the interests of its customers, including Plaintiff.

**D. Defendants Know the Program Must Provide a Reasonable Rate of Interest.**

40.     JP Morgan knew or should have known that it has a duty to offer retirement accounts investors a reasonable rate of interest, as evidenced by its own disclosures in some retirement accounts, and legal sources of which it has or should have knowledge.

41.     For example, Defendant JP Morgan Securities' Traditional IRA Custodial Agreement states with respect to sweep accounts that it will pay a reasonable rate of interest:

> [T]he Custodian may invest any uninvested cash held in the IRA in bank savings instruments or bank deposits bearing a reasonable rate of interest in JPMCB's banks so long as (to the extent necessary) such investment is in compliance with section 4975(d)(4) of the Code, Treasury regulations section 54.4975-6(b)(1), the class exemption of PTCE 81-8, dated January 23, 1981 or other applicable law.[3]

42.     Although Defendants did not include similar language concerning the payment of a "reasonable rate of interest" in the Plaintiff's JPM Security Agreement

---

[3] *See* https://www.chase.com/content/dam/chase-ux/documents/personal/investments/jpm-investment-account-agreements.pdf.

(because he is invested in a Self-Directed Investing Account), JP Morgan Securities' legal obligations under the legal sources referenced in its Traditional IRA Custodial Agreement also apply to Plaintiff and all Class members. Thus, Defendants knew or should have known that it was unlawful and a breach of their duties to provide far less than a reasonable rate of interest in the Program.

43.    The requirement to pay a reasonable rate of interest derives from the Internal Revenue Code ("IRC"). Section 4975 of the IRC (entitled "Tax on Prohibited Transactions"), applies to IRAs generally, including Plaintiff's IRA. *See* 26 U.S.C. §4975(e)(1)(B) (defining "plan" to include "an individual retirement account described in [IRC] Section 408(a)"). IRC §4975(c)(1)(B) defines as a "prohibited transaction" the "lending of money or other extension of credit between a plan [i.e., an individual IRA] and a disqualified person." A "disqualified person," under Section 4975(e)(2) includes, among others, "a fiduciary" and "a person providing services to the plan." Defendants and the Bank are "disqualified person[s]" under Section 4975(e)(2) and, therefore, the sweep agreement for retirement accounts between Plaintiff and Defendants are "prohibited transaction[s]" under § 4975(c)(1)(B).

44.    IRC §4975(d)(4) provides several "exemptions," or safe harbors, for otherwise "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution." (Emphasis added).

45.    Section 4975 recognizes that related party transactions into which customers are defaulted (such as JP Morgan's Program) can offer interest rates that may become unfairly lowered due to inherent conflicts of interest.  Accordingly, conflicted transactions such as affiliated entity cash sweeps are required to pay a reasonable rate of interest. Retirement account customers are particularly vulnerable to receiving inadequate compensation for the use of uninvested cash in their accounts. IRC Section 4975 thus seeks to ensure related party transactions involving retirement accounts are priced at fair market rates.

46.    Regulations promulgated by the Department of the Treasury confirm that the cash swept to the Bank is a "prohibited transaction" but would be permissible (i.e., be within the exemption or safe harbor) if it paid "a reasonable rate of interest." Thus, Treasury regulations state that "Section 4975(d)(4) exempts from the excise taxes imposed by section 4975 investment of all or a part of a plan's assets in deposits bearing a reasonable rate of interest in a bank or similar financial institution…, even though such bank or similar financial institution is a fiduciary or other disqualified person with respect to the plan." 26 C.F.R. §54.4975-6(b)(1).

47.    Treasury regulations also mandate that when a financial institution "invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization "must name" the institution and "must state that [it] … may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)." *Id*. § 54.4975-6(b)(3).

48.     Similarly, ERISA Section 408(b)(1) exempts from prohibition various interested party transactions that "bear a reasonable rate of interest," among other requirements. *See* 29 U.S.C. §1108(b)(1).

49.     Additionally, FINRA Rule 2122 expressly provides that "[c]harges, if any, for services performed . . . shall be reasonable and not unfairly discriminatory among customers."

50.     JP Morgan is a member of the American Banker's Association. A March 15, 2017 letter to the Department of Labor from the American Bankers Association, states that with respect to the investment of IRA assets into "one or more bank deposit products, ... banks have routinely relied on the statutory exemption [for prohibited transactions] available for bank deposit product programs under Section 4975(d)(4) of the Code…." In support of this contention, the ABA attached a white paper from Morgan, Lewis & Bockius LLP, which (at 4) specifically notes that a bank may "invest an IRA's assets in its own deposit accounts" "which bear a reasonable interest rate" pursuant to the exemption "found in Section 4975(d)(4) of the Code and Section 408(b)(4) of ERISA." This correspondence constitutes further evidence of Defendants' recognition that their sweep programs constitute conflicted, presumptively prohibited transactions that are only permitted if depositors are receiving a "reasonable" rate of interest.

**E. JP Morgan Securities Placed Class Members' Cash in Shockingly Low Interest-Bearing Accounts at Its Affiliated Bank**

51.     JP Morgan Securities breached its fiduciary and contractual duties by

failing to negotiate higher and reasonable interest rates for its customers' uninvested cash in operating the Program.

52.    As its customers' agent and financial advisor, JP Morgan Securities was contractually and legally obligated to act in the best interest of its clients. JP Morgan Securities' practice of extracting excessive fees from its customers' cash sweep deposits, through the negotiation of unreasonably low interest rates with affiliated banks, was against its customers' interests.

53.    JP Morgan Securities did not negotiate higher and reasonable rates of interest for its customers' cash sweep deposits, but instead it worked in consultation with its affiliated bank partners to set artificially and unreasonably low interest rates for Deposit Accounts in the Program.

54.    JP Morgan's low interest rates are not reasonable. Section 4975 and ERISA Section 408 place the burden of demonstrating reasonableness on the financial institution. Defendants cannot meet this burden because the interest rates they used in the Program do not meet any definition of a reasonable rate.

55.    Based on its ordinary meaning (using Webster's and Oxford dictionary definitions), "reasonable" is synonymous with "fair." Accordingly, "reasonable" in the valuation context is synonymous with "fair market value" and can be determined using a market approach of comparable instruments. A reasonable rate of interest is the rate that would result in a competitive market under fair market conditions – in other words, an interest rate parties would agree to in an arm's length transaction

where neither party is about exert market power over the other.

56.     Fair market value is defined by the IRS as: "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 25.2512-1.

57.     IRS regulations define an "arm's-length interest rate" for purposes of assessing transfer pricing between related entities as

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances. All relevant factors shall be considered, including the principal amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans between unrelated parties. [26 CFR §1.482-2(a)(2)].

58.     Consistent with the plain meaning of reasonableness, which means fair, a reasonable rate pursuant to IRC §4975 (and as acknowledged by Defendants in some of their agreements) is one that considers other market rates for similar products in arm's-length transactions.

59.     For example, the Department of Labor, which maintains enforcement authority with respect to the prohibited transaction rules in the IRC, provided in granting the exemption, a definition of "reasonable rate" that considered a broad range of similar products to bank deposit accounts:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase

agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

60.     Three-month treasury bills, an instrument the Department of Labor has advised should be considered in determining a reasonable interest rate, rose in yield from 0.046% as of January 1, 2022 to 5.394% as of January 9, 2024. Nevertheless, Defendants paid interest rates during this period that were a tiny fraction of these rates.

61.     Compared to its competitors, the JP Morgan Securities Sweep Program's interest rates are substantially lower than similar sweep products offered by other financial institutions. For example, Vanguard offered interest payments of 4.5% in its Cash Sweep Program; Moo Moo offered 5.1% in its Cash Sweep Program; and Fidelity offered 5%.

62.     Other brokerages that swept cash to unaffiliated banks set rates between brokerages and banks resulting from something that more closely resembles arm's-length negotiations. For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and have consistently paid substantially higher rates of interest than Defendants and other brokerages that sweep cash to affiliated banks.

63.     At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million). By contrast, Defendants have been paying interest rates as low as 0.01%—virtually nothing.

64.    The federal funds target rate continued to increase in 2023 hitting an effective yield of 5.33% on July 27, 2023. As the federal fund rate increased, so too did Fidelity and R.W. Baird continue to increase the rates they paid on swept cash. Defendants, by contrast, continued to pay close to no interest.

65.    On August 7, 2019, Fidelity issued a press releases announcing that "it has challenged conventional industry practices by automatically directing investors' cash into higher yielding options available for brokerage and retirement accounts as well as providing product choice – all without any minimum requirements." It continued, "Recent customer research shows that many investors don't focus on the rate paid on their cash when they open an account and, too often, they don't take action later. Fidelity has made it easy for customers by automatically giving them the higher yielding option at account opening, while also providing other investment options for those customers who prefer it." And, it noted that Fidelity's approach ""is contrary to typical industry practices of defaulting customers' cash into a low-yielding product – often at an affiliated bank – with no other option in what the industry calls a 'cash sweep.'"

66.    The rates set by Fidelity and R.W. Baird at arm's-length are evidence of the fair market or reasonable rates based on business and economic conditions. The rates set by Defendants, by default, in self-interested transactions, are not reasonable.

67.    Even when measured against other brokerages who use sweep accounts, Defendants are near the bottom when it comes to interest rates on sweep accounts.

68.    Morgan Securities' interest rates significantly lower than its competitors, but they are also substantially lower than interest rates for money market fund rates.

69.    Many of JP Morgan Securities' competitors offer programs that sweep uninvested cash into money market funds where their customers receive significantly higher returns on their cash, while JP Morgan Securities eliminated use of money market funds as a cash sweep option for accounts eligible for its Cash Sweep Program.

70.    But JP Morgan Securities automatically places customers into the cash sweep programs it has developed with low yield rates that it negotiated with its affiliated Bank.

71.    By negotiating significantly lower rates for the cash sweep programs in which it automatically placed Plaintiff and Class members, JP Morgan Securities did not act in its customers' best interests. Instead, JP Morgan Securities put its own interests above theirs, making substantial net income revenue at its customers' expense. In so doing, Defendants breached their fiduciary duties, including their own Code of Conduct.

E.    **Plaintiff's Experience**

72.    Plaintiff has an IRA-Roth investment account with JP Morgan Securities, and has had that account for many years. Plaintiff was enrolled automatically in the Cash Sweep Program, and so for years his uninvested cash has been automatically swept into the affiliated banks that JP Morgan Securities selected in its discretion, at rates as low as 0.01%.

## CLASS ACTION ALLEGATIONS

73.    Plaintiff re-alleges and incorporates by reference the allegations set forth above.

74.    Plaintiff brings this action individually and as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class consisting of:

**Nationwide Class**

All persons who held cash positions in retirements accounts custodied by Defendants and whose cash was subject to Defendants' Bank Deposit Sweep Program.

**California Sub-Class**

All California residents who held cash positions in retirements accounts custodied by Defendants and whose cash was subject to Defendants' Bank Deposit Sweep Program.

75.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

### A. Numerosity - Rule 23(a)(1)

76.    Class and Sub-Class members are so numerous that their individual

joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiff currently. However, Defendants oversee approximately $3.4 trillion in client assets through the work of thousands of financial advisors, and Plaintiff believes that the members of the proposed Class and Sub-Class number in the thousands. Accordingly, Plaintiff and the Classes satisfy the numerosity requirement of Rule 23.

77.    Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

**B. Existence and Predominance of Common Questions of Law and Fact - Rule 23(a)(2), 23(b)(3)**

78.    Common questions of law and fact exist as to all members of the Class and Sub-Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following, whether:

a.    Defendants owed fiduciary duties to Plaintiff and the putative Class members in connection with the Bank Deposit Sweep Program;

b.    Defendants breached their fiduciary duties to Plaintiff and the putative Class members in establishing, maintaining, and/or operating the Bank Deposit Sweep Program;

c.    Defendants' disclosures about the Bank Deposit Sweep Program contained material misrepresentations or omissions;

d.    Defendants breached their contract with Plaintiff and the putative Class

members regarding the Bank Deposit Sweep Program;

e.   Defendants conduct regarding the Bank Deposit Sweep Program violates the GBL;

f.   Defendants conduct regarding the Bank Deposit Sweep Program violates the UCL;

g.   this case may be maintained as a class action under Fed. R. Civ. P. 23;

h.   to what extent Class members are entitled to damages and other monetary relief; and

i.   and to what extent Class members are entitled to attorneys' fees and costs.

## C. Typicality - Rule 23(a)(3)

79.    Plaintiff's claims are typical of the claims of the Class because he was a customer of Defendants that had his cash balances improperly managed by JP Morgan Securities through its administration of the Bank Deposit Sweep Program. Thus, Plaintiff's claims are typical of the claims of the members of the Class as the claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to the members of each.

## D. Adequacy of Representation - Rule 23(a)(4)

80.    Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. Plaintiff has no

interests adverse or antagonistic to those of the Class.

**F. Superiority - Rule 23(b)(3)**

81.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

82.    Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

83.    Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a. the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of

conduct for Defendants;

b. the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**BREACH OF FIDUCIARY DUTY**
**(Asserted on behalf of the Plaintiff and the Nationwide Class against Defendants)**

84.    Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 83, above, as if fully set forth herein.

85.    At all relevant times, Defendants owed fiduciary duties to Plaintiff and the members of the Class in connection with the Bank Deposit Sweep Program. Such duties independently arose out of (1) the agency relationship between defendant JP Morgan Securities, on one hand, and Plaintiff and the members of the Class on the other hand, as to the Program; (2) Defendants holding and control over beneficial funds that belonged to its customers, related to their cash sweep balances; (3) Defendants' discretion as to the Bank Deposit Sweep Program and their customers'

cash, while acting as their agent; and/or (4) the applicable industry standards, including Reg BI, FINRA standards, and Defendants' Code of Conduct.

86.     As a fiduciary to Plaintiff and the Class, Defendants owed them the highest duties of loyalty, candor, due care, and prudence in as to the services they provided to them in connection with establishing, maintaining, and/or operating the Bank Deposit Sweep Program. Moreover, as a fiduciary, Defendants had a continuing duty to act exclusively for the benefit of Plaintiff and the Class in connection with establishing, maintaining, and/or operating the Program. Lastly, as a fiduciary, Defendants had a continuing duty to obtain informed consent from Plaintiff and the Class regarding the Bank Deposit Sweep Program, and specifically make sufficiently detailed disclosures regarding the Bank Deposit Sweep Program, their role, the role of various related parties, and any conflicts of interest to obtain such informed consent.

87.     Defendants further owed Plaintiff and the Class the fiduciary duty to act in good faith in connection with establishing, maintaining, and/or operating the Bank Deposit Sweep Program.

88.     Defendants further owed Plaintiff and the Class the duty to charge reasonable fees for their services related to the Bank Deposit Sweep Program.

89.     Plaintiff and the Class were fully dependent upon Defendants' ability, skill, knowledge, and goodwill with respect to Defendants' Bank Deposit Sweep Program.

90.     Defendants owed Plaintiff and the Class similar duties by virtue of their control over Defendants' policies or management regarding the Bank Deposit

Sweep Program.

91.     Defendants breached their fiduciary duties by the conduct alleged herein, including by designing, structuring, and/or operating the Bank Deposit Sweep Program to benefit themselves at the expense of their fiduciary customers, making material misrepresentations and omissions regarding the Bank Deposit Sweep Program, violating its duty of care, and acting in their own – not their customers' – best interest vis-à-vis the Bank Deposit Sweep Program.

92.     Defendants violated their duty of loyalty by, among other things, putting their interest above that of their fiduciary customers, failing to provide sufficient information to their fiduciary customers regarding material features of the Bank Deposit Sweep Program to obtain *informed* consent from them, and not properly disclosing their own and their affiliates' role in, and conflicts of interest arising out of the Bank Deposit Sweep Program, as more fully shown above.

93.     As a direct and proximate consequence of Defendants' conduct as alleged herein, Plaintiff and the Class suffered damages in an amount to be determined at trial and seek disgorgement of any undue and unjust gains of Defendants, as well as all other equitable relief deemed just and proper.

**SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Asserted on behalf of the Plaintiff and the**
**Nationwide Class against Defendants)**

94.     Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 83, above, as if fully set forth herein.

95.    Defendants' relationship with its customers is governed by a written contract, the terms of which are contained in, and incorporated into various standardized documents drafted by Defendants, including the JPM Securities Agreement and the JPM Deposit Account Agreement.

96.    The JPM Securities Agreement expressly incorporates the rules of applicable federal, state, and self-regulatory organizations including the SEC and FINRA. As shown above, these rules obligate Defendants to provide "reasonable rates" of interest for the Deposit Accounts in the Program.

97.    Pursuant to the JPM Deposit Account Agreement, defendant JP Morgan Securities undertook to act as an agent of the customers regarding all transactions relating to the Program and were thus contractually obligated to obtain for Plaintiff and members of the proposed Class, through such transactions, rates of return on their cash balances that are reasonable.

98.    As set forth herein, the rates of return paid to customers on their cash balances were not reasonable. Accordingly, Defendants breached their contracts with Plaintiff and the members of the proposed Class.

99.    Plaintiff and the members of the proposed Class suffered monetary damages because of Defendants' breach of contract.

## THIRD CAUSE OF ACTION
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW
(Asserted on behalf of the Plaintiff and
the Nationwide Class against Defendants)

100.    Plaintiff repeats and incorporates by reference the factual allegations in

paragraphs 1 through 83, above, as if fully set forth herein.

101.   The JP Morgan Securities Agreement states that it shall be governed and enforced under New York law, and there is a significant connection between New York and the conduct giving rise to Defendants' liability in this case: Defendants are headquartered in New York and decisions regarding the unfair or deceptive practices originated in New York.

102.   Deceptive acts or practices in the conduct of any business, trade, commerce, or in the furnishing of any service are unlawful in the state of New York.

103.   Defendants' acts and practices described in this complaint are "deceptive" under the GBL because they are misleading in a material way and because they have injured Plaintiff and Class members.

104.   In the course of their business and in the course of trade and commerce, Defendants have engaged in unfair business acts and practices under the GBL by, among other things, operating the Program to generate substantial revenue for themselves and their affiliated Bank with their customers' cash, while paying their customers only a small fraction of those returns through the use of unreasonably low interest rates on their cash sweep Deposit Accounts, and concealing these facts. Defendants have also engaged in material misrepresentations and omissions regarding material features of the Program.

105.   Defendants' deceptive business acts or practices present a threat and likelihood of harm and deception to Plaintiff and Class members. Defendants' unfair

conduct is systematic and perpetrated upon the public.

106.   Plaintiff and Class members have suffered an ascertainable loss of money, property, and/or value and were harmed and suffered actual damages because of Defendants' misrepresentations and omissions of material fact concerning the Program.

107.   Had Plaintiff and Class members known the truth about Defendants' conduct concerning the Program and the way it unfairly benefits Defendants and their affiliated Bank at their fiduciary customers' expense, they would not have participated in Defendants' investment products or would have done so on different terms.

108.   The gravity of harm resulting from Defendants' unfair doncut outweighs and potential utility.

109.   Plaintiff and Class members could not have reasonably avoided the harm from Defendants' conduct because only Defendants were aware of the truth concerning the Program and they did not disclose or did not sufficiently disclose those facts.

110.   Plaintiff and the Class have suffered injury in fact and have lost money as a direct and proximate result of Defendants' business acts or practices.

111.   Defendants acquired money to which Plaintiff and the Class members were solely entitled through their unfair conduct.

112.   Plaintiff and the Class members seek appropriate relief under the GBL,

including restitution in full and disgorgement of all profits relating to Defendants' unfair business acts or practices, and such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair practices.

113.   Plaintiff and the Class also seek reasonable attorneys' fees and costs under applicable law.

## FOURTH CAUSE OF ACTION
## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
(Asserted on behalf of the Plaintiff and
the California Sub-Class against Defendants)

114.   Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 83, above, as if fully set forth herein.

115.   The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

116.   By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

117.   Defendants' conduct as described herein violates the UCL.

118.   Specifically, Defendants' conduct was not motivated by any business or economic need or rationale. The harm and adverse impact of Defendants' Cash

Sweep Program was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

119.    The harm to Plaintiff and members of the California Sub-Class arising from Defendants' unfair practices outweighs the utility, if any, of those practices.

120.    Defendants' conduct was substantially injurious to accountholders in that they have been deprived of fair, market rate interest payments.

121.    As a result of Defendants' violations of the UCL, Plaintiff and members of the Sub-Class have paid, and/or will continue to suffer actual damages in the form of lost interest.

122.    Plaintiff alleges that Defendants have, in the course of their business and the course of trade or commerce, undertaken and engaged in unfair business acts and practices by, among other things, engaging in transactions relating to the Cash Sweep Program to generate substantial revenue for themselves with their customers' cash and beneficial returns on such cash, while paying their customers only a small fraction of those returns and concealing from such customers the portions of those customers' returns that they directed to and conferred upon their affiliates and the fact that those portions represented the vast majority of such interest. Defendants have further engaged in material misrepresentations and omissions regarding key features of the Program.

123.    The deceptive business acts or practices described herein presented a threat and likelihood of harm and deception to Plaintiff and the Sub-Class in that Defendants has systematically perpetrated the unfair conduct upon members of the

public by engaging in the conduct described herein.

124.    As a result of Defendants' misrepresentations and omissions of material facts concerning the Program, Plaintiff and the Sub-Class have suffered an ascertainable loss of money, property, and/or value and were harmed and suffered actual damages.

125.    Had Plaintiff and the Class been aware of the Defendants conduct with respect to the transactions relating to the Program, which greatly favored Defendants and their affiliates at their fiduciary customers' expense, Plaintiff and the Sub-Class would not have participated in those investment products or would have done so on different terms.

## PRAYER FOR RELIEF

Plaintiff requests relief as follows:

1.    Actual damages

2.    Punitive damages

3.    Injunctive relief prohibiting Defendants from continuing to engage in the conduct alleged herein

4.    Attorneys' fees and costs of suit;

5.    Prejudgment interest; and

6.    Such other relief as the Court deems just and proper

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 19, 2024                    Respectfully submitted,

                                             **EDELSBERG LAW, P.A.**

                                             */s/ Scott Edelsberg, Esq.*
                                             Scott Edelsberg, Esq.
                                             CA Bar No. 330090
                                             scott@edelsberglaw.com
                                             Adam A. Schwartzbaum, Esq.*
                                             Florida Bar No. 93014
                                             adam@edelsberglaw.com
                                             1925 Century Park East, Suite 1700
                                             Los Angeles, CA 90067
                                             Tel: 305-975-3320

                                             **Pro Hac Vice* forthcoming

                                             *Counsel for Plaintiff and the Proposed Class*